Number 21-1764. Mr. Wilkins, good to have you with us, sir. Thank you, Your Honor. My name is Billy Wilkins, and at council table with me is Colin Ram. The Supreme Court in the Alton decision described the NCAA and its university and college members as a massive business enterprise in which everybody associated with it, including Adidas, which is a financial sponsor of the University of Louisville, made millions, indeed billions of dollars. It was also a business, the Supreme Court said, that would be flatly illegal almost anywhere else in the United States because the laborers, the student athletes, were unlawfully restrained. So why would any high school superstar athlete like Brian Bowen even consider offering his labor and his talents at great personal sacrifice to go to a Division I university and play basketball there? Well, it's because early in his life, encouraged by his coaches, he decided to pursue a career as a professional basketball player in the NBA. And to pursue this career realistically, there was only one place to go. That's the University Division I basketball teams. As the Supreme Court recognized in Austin, the NCAA is the only, and I quote, relevant market for athletic services in men's and women's basketball. There is no viable substitute. Mr. Wilkins, do you agree that your client, he received all the compensation he could possibly get when he was participating in that market? When he was playing, or eligible, or even not eligible, but still in college, he received the maximum compensation he could receive as a college athlete? He did. Your arguments about his hopes that it would lead to a professional career? Well, that's the ultimate goal, but his hope was to obtain what he was entitled to under his athletic tender agreement. That is to the best coaching could be offered in the United States anywhere, the best athletic facility, the best conditioning, the best physical training, the best nutrition, all of those things that were stripped away from him because of this bribe that was paid to his daddy. Mr. Wilkins, let me ask you about that, because I agree, it seems that he expected for that, he hoped for that, he maybe even thought it was far more likely than not, but let me ask you this. Say he gets to Louisville, and they don't pull a scholarship, they allow him to attend Louisville, they honor his scholarship, and they say, you know, we're not going to give you those things, for whatever reason. Could he have sued the University of Louisville for breach of contract? No, actually I think he could have. It would not be realistic to think he would sue your own coaches, but realistically... Wait, what authority, because I looked, and I couldn't find it, but maybe I'm... What authority under Kentucky law suggests that he could have maintained a viable suit against the University of Louisville, who, again, in this hypothetical, is giving him his scholarship, he's enrolled at Kentucky, sorry, Louisville, excuse me, but, you know, if he sued them for breach of not coaching or breach of nutrition or breach of all these other benefits, what authority do you have for the proposition that under Kentucky law he would have had a viable breach of contract claim against Louisville? Just like a business license issued by a county or a city, or a pilot's license, commercial pilot issued by the FAA, or a recognition of de facto tenure by a college, or a certificate of eligibility that he had, this entitled him to certain things. When he signed, because of that eligibility certificate, he was able to accept and did accept that athletic tender agreement. I understand that sometimes people are entitled to benefits that are not expressly written down, but that's a matter of, generally, state law. What is the authority for the proposition that these types of benefits would support a breach of contract action under Kentucky law? And he had an entitlement under Kentucky law, in fact, every state that I know of, and in federal law, he had an entitlement. And that entitlement... I mean, he can assert anything he wants, but what is the evidence that he has a legal right that would be recognized in Kentucky? He had an entitlement based upon the policies and the practices and the traditions to receive these things that he agreed to give his labor for. And if it was denied him improperly, he could bring a lawsuit against the University of Louisville or whomever denied him, in this case Adidas, of that right. Now, I realize, Your Honor, that we... You aren't suing under contract. No, sir. You're suing under RICO. That's right. You're suing under RICO. That's what we're faced with here, is whether you... It's a RICO case, but Judge Anderson threw it out on standing, didn't he? Yes, sir. That's right. That's the big issue here. That is the issue. He had an entitlement, and it was stripped away from him because of the bribe that was paid to his father. The district court says he doesn't have standing to sue. He said that because the district court did not understand... How is that an error? That's what we've got to figure out. Well, it's an error because the district court said, well, he got his scholarship. He's still at Louisville. He could have stayed there for four years, I guess, but he left after one semester to try to pursue, best he could, his athletic career. But the scholarship was not what was at issue here. He could have gotten that same scholarship from 50 universities because they all offered the same scholarship. He didn't go to Louisville because of the outstanding chemical laboratory of the math department. He went there because he was entitled to the best coaching. He was promised the best coaching and all of those other things. The NCAA says these are called... We're going back to the contract then, and there is a contract, and it's written down. We're supposed to look at the contract and see what each side agreed to. Now, there might be evidence outside the contract about they tried to get me to come by saying I was going to get the best coaching. I was going to get early minutes. But the contract says that we will give you tuition, and we will pay for all of these things, and you will come to our school. Why am I looking outside the contract to figure out what his property is in the contract? Well, there was no integration clause in this contract, period. Number two... Does that mean under the law, just because there's an integration clause, I can look outside to what any external evidence of intent was? Yes. I don't think so. I do. Yes. If the contract's unambiguous, we look at the contract. The contract... We look at tradition. We look at the intent of the parties. We look at what has gone on in the past. We look at custom to see what was implicitly understood by the parties. And there is no mistake here, really, Your Honor, that it was understood by Brian, Louisville, the coaches, indeed the NCAA, that these are the things that he would receive. Because that's what these schools, Division I schools, bargain with. We've got the best coaches. We've got a $237 million facility. We've got the best nutrition program. You need to gain at least 20 pounds, but not fat. You need muscle. We've got this nutrition. But that's how they sell the school. And so it's implicitly implied. Is there something called parole evidence in the context of this case, beyond the terms of the contract? Absolutely. Absolutely. In fact, if you look at the NCAA bylaws... But you go well outside the specific provisions of the contract and prove all this other stuff. Well, absolutely you do, because if you've got a contract that does not have an integration clause, you can look for tradition. What was the intent of the parties? Indeed, you look to the NCAA bylaws... You've got to have a bunch of predicate acts which constitute crime. Well, that's right. And what are your predicate acts that you'd prove here? The predicate act here was when Adidas facilitated the payment of a bribe to his daddy. And that led directly, directly to him being declared in a state of being recognized as a state... What are the federal crimes that arise there? Mail fraud? Wire fraud? That's right. Mail fraud. Wire fraud. All of that. And that's not really an issue before the court. It's not contested here. That happened. And they falsified the records of Adidas to cover up the payment? They did. Can I go back? We've been talking about... We're just talking about this one fellow. This looks kind of bad for the college basketball program. Go ahead. Can I ask you... So we were talking about rights that he may or may not have under a contract, but of course RICO doesn't refer to injured in your contracts. It says injured in your business or property. And I see a lot of discussion in the briefs about what property does and doesn't mean, but very little discussion of what injured in your business means. Could you tell me what does your client think an injury in his business means and why does your client satisfy it? Or are you relying solely on the word property? I guess that's the other question. I'm just trying to parse out business versus property and what they do and mean and where they overlap and where they don't. His certificate of eligibility that was issued to him was his key to open that door to Division I basketball. And with that came that athletic tender agreement that provided all of these benefits. And in the language of RICO, is that key, is that a business key or a property key? Because RICO doesn't say injured in your key. It says injured in your business. It's hard to make the distinction. Is it a business or a property? It certainly is a property interest that he had. Just like an FAA pilot's license or a business license issued by a county. It is something that he had that was the only thing that could open that door for him to pursue that career. And it was a property interest. Indeed, Adidas' president testified in his deposition. Yes, he said, I acknowledge that a certificate of eligibility has significant value, to use his words. And that's what this young man had. And it was stripped away. Do you think that anything that has significant value is business or property under RICO? I can think of lots of things that have value that I wouldn't necessarily think of as business or property. Well, there may be value in many intrinsic ways, I guess, Sean. And I don't disagree with what you say. But this had real value in terms of making a lot of money. And that's what the expert said, Stephen Bratz. He's been in the NCAA for over 36 years as a player, as a coach, as a scout, and a personnel professional evaluator. And he testified in his opinion. If this certificate of eligibility had not been stripped away from Brian Bowen, he would have been, two years out, a first-choice NBA draft choice. He would have gone and he would have been between 16 and 21. And if you look at the pay chart, now this is all. Does the certificate of eligibility, though, have independent value as business or property apart from converting it into a contract? You know, you have to maintain eligibility from a young age, right? There are high school students who are maintaining their eligibility. But a lot of them don't have what it takes, right? It means it's valuable, but it's not a business or a property interest, perhaps, until they turn it into a contract or an agreement to play for a certain school. I think there might be a connection there that is that eligibility valuable? Is it business and property by itself apart from the contract? Well, I think it is, Your Honor. I mean, it's the key. If you don't have this key, this certificate of eligibility, you can't get in the door. The door is shut. But it's not enough by itself. No, but that certificate, just like the FAA issues a commercial pilot's license, that license itself sits in his desk, but it gives him the right to go to that commercial airline and get a job and fly that commercial plane, just like this certificate of eligibility. Put him in that very rare category of students, athletic students, young high school students, who can go into a Division I school with a four-year, no-cut contract, be guaranteed all of these things to increase his athletic ability, that would springboard him to be a number one draft choice, according to the experts. And, by the way, that's undisputed. Adidas offers no testimony that had this eligibility not been stripped from him, he would have been a first choice, draft choice, first draft. NCAA schools are what the farm teams for the NBA. Is that what? Yes, sir. That's the structure of it all? In fact, you can't get to the NBA hardly unless you come from Europe, someplace else, unless you go to a Division I basketball team in this country. As the Supreme Court said, they have a monopoly. This is it. You've got to go to a Division I school, and you need to play. And, of course, the rules require you to stay out of high school for at least one year, so you can either sit around or do nothing, or you can play basketball at a top-flight school. Of course, everybody who tries to get to the NBA, that's what they want to do, and that's what this young man did. This RICO statute was racketeering, influenced and corrupt organizations, was set up to combat organized crime. It wasn't supposed to be stretched to this kind of stuff, was it? Well, you know, there's a lot of argument that that's the case, but RICO has been stretched and interpreted much more broadly than even perhaps some of the drafters of this statute visualize. But there's no question here, this is not an issue, that this is a RICO violation, if it is one at all, that's what it is. No one says it's not a RICO for this conspiracy to offer this bribe to his father to encourage him to ensure that he went to the University of Louisville. That was the purpose of the whole scheme, to get this young man, who was a top-flight student-athlete, to go to Louisville. Not somewhere else, Louisville. And that's where he ended up going, and that's where he gave his labors and said, in return, I want all of these things that you've guaranteed that I'm going to have. I agree, John, it was not in writing, but it doesn't have to be. You look to what happened the year before, or ten years before, or what was happening while he was there for two months. He was receiving all of these things. And indeed, the NCAA bylaws enumerate all of these things that he got. Coaching, practicing, nutrition, training, physical training, all of these things. And they say to this university, you can't give him more than what we're going to allow. Every day, each student-athlete at Louisville's name is on the board, and the number of hours devoted to coaching, weight training, nutrition, practice sessions, strategy sessions, all of that is enumerated, because you can't give them more. NCAA says that what we say you can, because they know the university will push them to the limit, and beyond the limit if they can, because that makes them a better athlete, makes them win more games, more money coming in from the box office. So even though things that are guaranteed are limited. Let's see what Mr. Taft has to say about this. Thank you, Your Honor. Mr. Wilk, would you say some time? Mr. Taft? Good morning, Your Honor, and may it please the Court. Good to have you here, sir. Will Taft, on behalf of the defendant at police, including our client, Adidas America, Incorporated. I'm joined here today by Nathan Richards, my colleague. This case presents four core questions, whether Appellant had a contractual right under a scholarship agreement to a spot on the men's basketball team at Louisville. Second, whether he had a right to participate in interscholastic sports derived from some other source. Third, whether he had a right to be selected in the first round of the 2019 NBA draft. And fourth, whether any of the injuries alleged by Appellant were directly and actually caused by the alleged predicate scheme. Judge Anderson, below, correctly dismissed this case for lack of standing. The summary judgment was bifurcated, and he was addressing only the standing issue. I say that because the RICO predicate is contested. So the standing is the only issue we face? Correct, yes, Your Honor, although standing both the lack of an injury to business or property and also the parties have briefed the lack of direct and proximate causation. I just say that because, to be clear, the fact of a RICO predicate having been committed is contested, and if this ever went back to Judge Anderson, there would be summary judgment. No, but if we ruled that Judge Anderson is wrong and that he has standing, it has to go back. There's a further phase of summary judgment. We don't have anything else to deal with beyond standing today. Correct, Your Honor. So turning to the contract, it's... Can I just ask you before that, because I was... this is not an area out of background.  This is just the way that courts sometimes use jurisdiction when they don't really mean jurisdiction. This is just a question about whether he states a claim under RICO. That's correct. It's a statutory element of the claim. It can be waived. It is not jurisdictional. And so turning to the contract, it's undisputed that Louisville complied with all of the express terms of the scholarship agreement. There's no ambiguity on the contract, and therefore the interpretation really stops there under Kentucky law. You look at the plain language, and then you stop. What Appellant is arguing is that there's an implied right in this contract to be on the team and to receive various basketball benefits. This same argument has been considered and rejected by multiple courts, including Jackson v. Drake University, which involved a Division I basketball player on scholarship who had been told he would be a star, who claimed that he had a right under his scholarship agreement to play, and the court disagreed. You had the same result in Hisaw v. Washburn, University District of Kansas, 1987, involving football scholarship players. And even the case cited in the reply brief by Appellant, Brands v. Sheldon, doesn't state that a scholarship gives you a right to play on the team and indeed acknowledges that there is no general right to participate in interscholastic sports. The proffered distinction between a tender agreement... There's a right to try. Is there a right to try? Right to try. There's... These young men and young women seek to do, and they have a right to make efforts, and they have a right, I would think, to have the people they're dealing with be honest. And there's a lot of stuff in this record that stinks. Your Honor, looking at the contract, though, as the court and circuit held in Colorado Seminary, the right of a scholarship athlete to play on the team is no more than the right of a walk-on because the contract doesn't give you a spot on the team. The implications of Appellant's argument would be that any time a player gets cut or any time a coach doesn't run enough plays for the player, or he's asked to play a position other than what he wants to play, there's a breach of contract claim. And again, we don't see those claims because the rights under these scholarship agreements don't exist. There was nothing different about Bowen's scholarship agreement. As Alston pointed out, the defining characteristic of these scholarship agreements is that players are offering their athletic services in exchange for tuition, room and board, money. Schools want the best players. The schools want to get the good players come to them. And under this record, folks are out there paying off the parents to attract the students, the student athletes, and get them there. We're talking about an 18-year-old. As I say, there's a lot of stuff here that stinks. Again, those are the factual allegations. And for purposes of this summary judgment, we're accepting those as true for purposes of this summary judgment. We take them as true for purposes of this case. So for purposes of this appeal, true, but does not support RICO standing. Because again, no contract right to play, no general right to play. You might be right on the legal point. Maybe you're right, but there's much stuff here that stinks. I hope I'm right on the legal point. RICO was supposed to be organized crime. That's what it's called, or what it was for. I was around when it started. And the class of private plaintiffs who have causes of action is extremely limited, including by this standing requirement. You have to have all these predicate acts, which have to be criminal acts. And there's a specified types of criminal acts, different statutes. But mail fraud and wire fraud and robbery and those kinds of things are within those acts. And again, we're conceding for purposes of this appeal on summary judgment that there was a RICO predicate, but only for this appeal. But even so, you can't establish causation for harm. Mr. Taft, can I ask you the same question I asked your friend on the other side? I saw a lot of briefing about what property means under RICO, but I saw, candidly, very little briefing about what the word business means under RICO. What does Adidas think business means, and why do you think that he doesn't show it? So I'm quite familiar with your argument that he's not shown injury to his property. What is your argument that he hasn't shown injury to his business? Well, his business, to the extent that he had a business as a pre-professional amateur athlete, his business interest was receiving what he was entitled to under his scholarship, which he did. In this case, it would be a room and board tuition. And why? Because I guess what I'm saying is when RICO uses business or property, basic principles of statutory construction tell me that business can't simply just mean property. It has to mean something that is a non-complete Venn diagram overlap with the word property. What do you think business covers that property doesn't? So let me give a few examples. If a company is deprived of the services of its employees because they're being intimidated by a racketeering scheme, it would be a pity if your employees didn't show up to work tomorrow, something like that. Well, there's a national organization of women case which involved an alleged scheme interfering with employees at an abortion clinic. And that was held to interfere with the right of that company to the services of its employees. There are cases holding that lost past profits, sort of lost business, deals that would have happened in the past. American Honda from Maryland finds that that, you know, I think it's hard to say that I have a property interest in a sale that I didn't make, but that is a business harm because I have an active operating business. Appellant was receiving everything he possibly could have received in terms of compensation for his tendering his athletic services. He had a max deal, and the University of Louisville had told him in writing, J.A. 751, I believe, that he would be entitled to keep his scholarship if he chose to stay. So then let me give you that hypo. So this is the hypo that I'm having candidly a little trouble with. So I understand your guy never played a minute of Division One college basketball. And your whole point, I think, is everything is super speculative. Who knows what's going to happen? Right. But imagine someone. There was a player at Duke a number of years ago who like literally every single person on Earth knew was going to be the number one draft pick. Right. Who's drafted by the New Orleans team. And imagine that the week before the draft, a Rico enterprise proceeds to do a series of crimes that are predicate offenses. It's a Rico enterprise. They do a whole series of crimes that are clearly Rico predicates designed to destroy his draft stock one week before the draft. Has that person been injured in his business? And if so, what's the categorical difference between that person and this person? I think it would matter what what steps with the causal connection is. Oh, no, he's going to be drafted like literally next week, number one in the NBA draft. And someone's going to do a series of Rico predicates, I mean, designed to make sure that doesn't happen. They break his leg or they do an incredibly elaborate libel scheme designed to destroy his reputation and try and tank his draft stock or something like that. Again, I mean, the requirement under Slays for Proximate Cause is that the injury be suffered at the first step and that it not just be foreseeable, but really. Oh, no, no. The whole point of this Rico enterprise is to destroy this person's draft stock. That's the reason for the Rico enterprise. OK. Even then, I would say that his injury is a mere expectation because he doesn't have the contract yet. And he has an expectancy, a genuinely held expectancy. But that is not a property at that point. He agreed to that point. He may be in the business because he is no longer an amateur. That's what I'm saying. I've declared that I've committed myself to the life course. So I admit it's a it's a closer case because he has declared for the draft at that point. And he is, you know, in the process of he would have signed contracts that require him to do certain things with respect to the NBA. But I don't think he he can say that he was had an entitlement to be selected first. I don't think he could say he had an entitlement to be selected in the first round. But why does injury in my business require an entitlement? I don't have an entitlement to have customers come into my store. But if a Rico enterprise intimidates all of my customers, I still have been injured in my business. You told me if you had if you have an active business at that point, you do have a concrete financial harm. And again, it's looking back to the concrete financial harm. And the closer you get to actually being employed and actually having a contractual right to salary, the the closer you get to being able to establish a business arm. I agree that the cases do not spend a lot of time. And it's not the briefs aren't ignoring cases, to my knowledge, because the courts haven't spent a lot of time distinguishing business and property. But we know that mere expectancies are insufficient. We know that hoped for outcomes are not sufficient. And that's both true with respect to defining the business or property interest. Mark Antonio, Western District of Virginia, in 2015 involved a scholarship student who was not able to participate on the UVA swim team. He said, well, I've got an expectancy. I want to do this for my professional career. And he sued under Virginia business conspiracy, which had the same business and property requirement. There, the court said that your expectancy in your future career is insufficient. Swimming's not quite comparable to NBA basketball. Maybe in dollars. What's Adidas into all this for? Trying to sell shoes? Why are you trying to market besides shoes? Excuse me, Your Honor? Adidas, they're trying to sell shoes? So Adidas is an apparel manufacturing company. And they're competing with Nike. And you sign up the college basketball teams because you want to market shoes around the world to young people. The college sponsorships are part of marketing and they're part of supporting sports. And then you get into underhanded activity that contravenes a lot of these statutes that are identified in the Brico statute as predicate acts. Yes, Your Honor. They need some lawyers to advise them ahead of time, I would think. And the question is how far down the causal chain and how attenuated is the harm that is actionable? This young man is on the end of it. In my view, he's a victim of all of it. A lot of them come from underprivileged areas, underprivileged kids. It's the only opportunity in life. As Judge Anderson said, there's no doubt that his expectations about how his path to the NBA would unfold were disrupted. But, again, he made it to the NBA and he didn't have a right under his contract or under this court's precedent in equity and athletics, the Tenth Circuit decision in Colorado Seminary, to participate in interscholastic sports. I would like to say a word about Alston, given the focus that it gets. Alston is an important antitrust case, but it doesn't address business or property standing at all. It wasn't challenged by the NCAA, and neither the District Court, the Ninth Circuit, nor the Tenth Circuit addressed it. But the harm being alleged in Alston is important. Does your hypothesis the NCAA just overlooked a winning statutory standing argument? If the court had addressed it hypothetically, they would have seen, I think, that the student-athletes in that case were asking for money, or at least arguing that the antitrust violation had resulted in them receiving less money for contracts that they had entered into. And, again, that is not the harm that Appellant is claiming here. Appellant is claiming that he was harmed by not being able to play. But, again, we have seen the contract on its face, no right to a spot on the team. What is your response to Plaintiff's argument comparing NCAA eligibility to a business license, like an FAA certificate? So having an FAA certificate, first of all, I haven't seen any cases sort of drawing that analogy. But an FAA certificate, I would say, you know, is required in order to fly a jetliner, but it doesn't give you a right to a job at an airline, and it doesn't allow you to lose it. I'm not sure that you would have been deprived of a property right. Now, if because you lost it, you lost your job and you lost your salary, that would be a concrete financial harm. But, again, Appellant didn't lose his salary. He was entitled to keep everything under the scholarship agreement that he was entitled to. So the real problem, the real distinction I'm hearing in this response and in the response to Judge Hyten's questions has to do with the business in which he's engaged. He's currently engaged in business as a college athlete, but he had only an expectancy of being in the business of being a professional athlete. Yes, Your Honor. And, again... The eligibility certificate, Mr. Wilkins said. That's the interest. That is, well, again, and courts who have looked at eligibility have found that it's... And you all undermine these eligibility by paying off his father under the table. Eligibility entitles you to receive a scholarship agreement. It entitles you to go to school and play basketball. Well, it doesn't, Your Honor. It entitles you to a scholarship, which you got. Every time the case is looking at loss of eligibility, Colorado Seminary... I'm eligible in order to play. You need to be eligible in order to play, but if you... I'm eligible in order to play. That's what it is, eligibility to play. Well, it's... You say he might not make the team. Maybe he won't. He might get hurt. He might have played and played badly. We don't know. But he can't play unless he's eligible. Right, but the loss of that ability to play in NCAA sports is not a tangible, concrete financial harm, provided you're getting everything you're entitled to under the scholarship. Robert Parrish, the chief in the Fifth Circuit, was found not to have a property interest in his future professional career when he was withheld from NCAA tournament games. This court looked at the same thing in equity and athletics, finding that the fact that James Madison University eliminated certain athletics teams, preventing their scholarship athletes from competing on those teams, did not implicate property interests in that case. Were those RICO cases? Those were not. They were due process cases. But again, courts look at due process cases. They look at state law to figure out the scope of rights protected under RICO. If I can turn quickly to two remaining points. On the NBA draft, it's absolutely disputed as a factual matter, or was, that he would have been drafted had he been able to play in the NCAA. But moving beyond... He was one of the best high school players in the country, wasn't he? He was ranked high and had an expectancy of playing, but he admitted that he had no right at his deposition to play. His agent admitted, or started to be drafted, his agent admitted he had no right to be drafted. That's at JA 502 and JA 1230. And they both admitted that there are multiple factors that go into whether or not a player gets drafted. He was thought by a lot of people to be a real good prospect. That's the reason they were paying off his daddy to get him in school, get him in the right place. And again, these were expectations. They were not entitlements by his own admission. They were acts, which they say are predicate acts to federal crimes to a RICO violation. Paying off his father. That is the allegation, but how far... No, it's the allegation, and we take it as true. It's not an allegation for us. It's on this record. It's taken as true. It's taken as true that it's a RICO predicate. It's taken as true. But what Judge Anderson looked at was also that payment, what are the direct consequences of that payment? A direct consequence of that payment is not that he didn't get drafted. Some direct consequences ought to be that some people go to the penitentiary. And defendants have. And companies like Adidas clean up their act. Certain of the defendant appellees have. Whether this young fellow gets anything or not, there's something that needs to be cleaned up. So in that sense, the purpose of... There are defendant appellees who were charged, who were convicted, and who are serving sentences, not Adidas. But, again, that purpose, that need has been met. Well, Adidas shouldn't be falsifying records. They should not be falsifying their records to cover up payoffs. To turn to, very briefly, and I know I'm over time, an alternative ground of affirmance is the proximate cause and but-for cause. The record shows very clearly, and really undisputed, that Brian Bowen had lost his eligibility long before the alleged RICO scheme by his father receiving payments from Christian Dawkins and his high school coach. Again, the hearsay objection that's raised in the reply brief was not raised below and is waived, and our opposition brief lays out the evidence that Judge Anderson could have relied on that's undisputed, establishing his lack of eligibility, including the NCAA rules and the unrebutted declaration of Professor Petuto as to how those bylaws apply. Finally, the other injuries with respect to is the $750 of attorney's fees that he paid weeks before summary judgment briefing started and years after the services were alleged. The record before Judge Anderson shows that his father paid the attorney's fees, that the attorney was not seeking payment on that 2018 invoice. Clearly, this was a voluntary payment, and the decision after summary judgment was issued to waive privilege with respect to an engagement letter that they had previously withheld in order to support a showing of direct personal financial injury was untimely. Under this court rule in JTH tax, that information was available to appellant. Indeed, they made a decision not to waive privilege and only attempted to introduce it after on a motion for reconsideration. But even the lawyer fees in general, as courts have held, including in straights amusements, when you hire a lawyer to remediate harm suffered as a result of a RICO violation, that breaks the causal chain. So even if you were allowed to consider that evidence and that $750 payment, you still would not have RICO standing. Unless the court has other questions, I will sit down. Thank you very much, Mr. Taff. Thank you, Your Honor. I misunderstood my colleagues, so I want to be sure that the record is straight. The certificate of eligibility was absolutely required before Brian would even be considered by any basketball team in the NCAA to play ball. Once you get that certificate, the door is open, and he was then offered this athletic tender agreement. And under Kentucky law, in the Henry Conco case, cited on page 7 of our brief, an agreement will imply an obligation to carry out the purpose for which the contract is made. And how do you find the purpose? You look to tradition, you look to the intent of the parties, you look to custom. And indeed, when Brian was ineligible, the athletic department, the assistant, sent this letter out to all the coaches, and he said, Brian is ineligible. He is ineligible to participate in practice, conditioning, he no longer can participate in weight training, sport performance, skill instruction, strategy instruction, and other accountable activities. All of these things were given to all of these athletes, past and present, who were certificately eligible and had signed the athletic agreement. And this is the agreement that Brian signed. It's a no-cut, four-year contract. Only 4% of basketball players get a contract like this, usually it's a one-year. And he cannot be cut for any athletic reason. This was a right that he had, it was a property interest, and this idea that he got everything he bargained for, that he gave his labels for this scholarship, that was incidental to him going to the University of Louisville. He got a lot more than an academic scholarship. He got the right to have the best coaching and all of these other accountable activities that I've mentioned. Now, when Brian was 16 years old, it's alleged, and it's highly disputed whether or not the facts even come close to a violation of NCAA rules, that his father received money from a runner for some kind of fund that tried to represent athletes after they got to the NBA, as well as a high school coach for expenses and other things. It has never been determined by anyone, any entity, any power, anything, that this was a violation of any NCAA rule. But yet they say, we can bribe him all the time, because he had already accepted bribes when Brian was 16 years old. Now, if you look at the difference, if you read the NCAA rules, there's a huge difference between an amateur status, which Brian was as a high school student, and an enrolled student-athlete, which he was when he signed that athletic tender agreement and entered the University of Louisville. The rules are much stricter for those people in that category than those athletes who were high school students. And the expert testimony, John Corns, he's a compliance officer. He knows the rules. That's what he's been doing for 20 years. He said, no, it is not an automatic run to a student ineligible if they're in an amateur status, a high school student, and their daddy does something that may look like it's improper. Because things can happen. Eligibility can always be given. It may be a condition, like you've got to pay the money back, you've got to sit out the first four games, and stuff like that. But to say that they could, with impunity, bribe his father and suffer no consequences, because when he was 16 years old, his daddy may have taken some money for expenses and so forth, which is highly disputed whether that would ever, ever run to him ineligible. What Adidas did, they paid that bribe, or had it paid to his father. They destroyed his eligibility at that moment. He was rendered ineligible right then. And that then, of course, was direct. The cause of that was the loss of his athletic tender agreement and his future to play in the NBA. The difference that the district court and what Adidas has seized upon is the constitutional right, the lack of a constitutional right to play basketball. Of course you don't have a constitutional right to play basketball, to be out there on the court. But Brian Bowen had a right to be on the team, to receive all of the benefits that all of the players, his 12 other teammates received. He had a right to that, a property right to that. And that bribe took it away. Thank you. Thank you, Mr. Wilkins. We very much appreciate the argument of counsel and the written submissions and having you with us today. I wish we could come from the bench and greet you in the well. The court as this court has done in its existence until this pandemic. And we're not doing that now. But we're going to have you back sometime and we'll be able to do that. But we'll shake hands with you from here and it's good to see all of you. And thanks so much.
judges: Robert B. King, Allison J. Rushing, Toby J. Heytens